FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 30, 2026

SEAN F. MCAVOY, CLERK

*AUSA: LCG*

*County of Investigation: Benton*

*In Re: Criminal Complaint and Arrest Warrant*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

STATE OF WASHINGTON )
) SS:
COUNTY OF SPOKANE )

I, Justin Bodes, being duly sworn, do hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a criminal complaint and arrest warrant under Federal Rules of Criminal Procedure 3 and 4 to authorize the arrest of ASHTON HAMED ELLABOUDY (a/k/a "Ashraf Hamed Ellaboudy") ("ELLABOUDY"), a resident of Richland, Washington (WA).

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since January 2020. I completed the Basic Field Training Course, FBI Academy, Quantico, Virginia in September of 2020. In completing this course, I received instruction in Constitutional Law and the establishment of probable cause. I am currently assigned to the Inland Northwest Joint Terrorism Task Force. I have participated in numerous investigations involving felonious crimes including the unlawful manufacture and possession of destructive devices. In addition, I have received training as an Assistant Coordinator for the FBI Weapons of Mass

Destruction ("WMD") program including recognition of precursor chemicals often used in the formulation of homemade explosives.

3. Prior to joining the FBI, I served as a U.S. Marine and conducted multiple combat deployments in support of Operation Iraqi Freedom and Operation Enduring Freedom. I received extensive training on counterterrorism operations including common tactics used by foreign terrorists to conceal their identities and obfuscate their intentions.

4. As a result of my education, training, and experience as a Special Agent for the FBI, I am familiar with federal terrorism laws, specifically, 18 U.S.C. § 2339B, which makes it unlawful for any person to knowingly provide material support or resources to a designated foreign terrorist organization, or attempt or conspire to do so. "Material support or resources" is statutorily defined as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications, equipment, facilities, weapons, lethal substances, explosives, personnel (one or more individuals who may be or included oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(1).

5. This affidavit is submitted for the limited purpose of establishing probable cause to support a criminal complaint and arrest warrant charging ELLABOUDY with attempting to provide material support and resources, namely, personnel, services, expert advice and assistance, and electronic components, to a designated foreign terrorist organization, namely, Ansarallah, in violation of 18 U.S.C. § 2339B(a)(1). This affidavit does not include each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that ELLABOUDY has committed the offense alleged in the complaint.

6. The information contained in this affidavit is based on, among other things, my personal participation in the investigation of ELLABOUDY, information conveyed to me by other law enforcement agents, and physical and documentary evidence. The conversations, some of which were conducted in Arabic, detailed in this affidavit are summarized. The summaries are based on draft translations that have been reviewed for accuracy and edited by either a certified Arabic translator or an FBI Special Agent familiar with the Arabic language.

## BACKGROUND AND APPLICABLE LAW

7. Title 18, United States Code, Section 2339B(a)(1), Providing Material Support to Designated Foreign Terrorist Organizations, provides, in pertinent part, that:

> Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be . . . imprisoned not more than 20 years . . . To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism. . .

8. The term "material support or resources" is defined, in pertinent part, as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(1). Expert advice

and assistance are further defined as "advice or assistance derived from scientific, technical, or other specialized knowledge." 18 U.S.C. § 2339A(b)(3).

9. Pursuant to 18 U.S.C. § 2339B(h), an individual may be charged with providing "personnel" to an FTO when "that person has knowingly provided, attempted to provide, or conspired to provide an FTO with one or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operations of that organization." Section 2339B(h) further states "[I]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control."

## PROBABLE CAUSE

### Ansarallah ("Houthis")

10. On March 5, 2025, the United States Secretary of State designated Ansarallah, as a foreign terrorist organization ("FTO") under Section 219 of the Immigration and Nationality Act. On February 16, 2024, the United States Secretary of State designated Ansarallah as a Specially Designated Global Terrorist under section 1(a)(ii)(A) of Executive Order 13224, as amended. The Secretary of State has also listed the following aliases for Ansarallah: Ansar Allah, Ansarullah, Partisans of God, Supporters of God, and Houthi group. To date, Ansarallah remains a designated FTO.

11. As part of this investigation, I reviewed ELLABOUDY's employment and educational experience and I know ELLABOUDY is currently employed with the U.S. Department of Energy ("DOE") as an electrical engineer in Richland, Washington, having started employment with DOE on or about December 16, 2022. According to ELLABOUDY's resume, he earned a Masters-in-Science in Electrical Engineering from the California Polytechnic State University located at San Luis

Obispo, California. Prior to his employment with the DOE, ELLABOUDY was employed as a Technical Section Engineer with the U.S. Army Corps of Engineers ("USACE") and was assigned to the McNary Lock & Dam located in Umatilla, Oregon beginning on or around September 2021. ELLABOUDY was also an officer on active-duty status with the U.S. Navy on or around December 2007 to September 2011. ELLABOUDY was assigned as a Naval Construction Electrician and was stationed at the Naval Base Port Hueneme in California. Following his active-duty service, ELLABOUDY was a reserve officer assigned to the United States Naval Reserve from January 2015 to September 2021.

**Initial Notification – Procurement of Explosives Precursors and Materials used in the Construction of Explosives**

12. Between November 2024 and February 2025, the FBI received information from several companies that engage in e-Commerce or the sale of chemicals, indicating that accounts attributed to ELLABOUDY had purchased multiple components that are commonly used to manufacture explosives. These companies provided information listing several of the chemicals and components ELLABOUDY purchased and that these items were shipped to ELLABOUDY's residence located at 1444 Oxford Ave, Richland, Washington, (hereinafter the "Ellaboudy Residence"), which is located within the Eastern District of Washington. Specifically, these companies indicated that ELLABOUDY purchased: firework igniter parts, acetone, red iron, methanol, isopropyl alcohol, sulfur powder, drain cleaner, sodium bisulfate, ammonium hydroxide, gas mask, drone parts, nitric acid, ammonium nitrate, hydrogen peroxide, sulfuric acid, hexamethylene tetramine, aluminum powder, potassium nitrate powder, ammonium perchlorate.[1] In March

[1] In assessing these items, FBI Chemists and Special Agent Bomb Technicians noted in their assessment that some of the items have uses beyond IED production.

2025, I learned between March 8, 2024 and December 17, 2024, ELLABOUDY also purchased multiple types and sizes of PVC pipe, couplers, and end caps, as well as cement, washers, an aluminum rod, propane fuel, a utility torch, and vinyl tubing. Based on my training and experience, and discussions with explosives experts, I am aware these chemicals, when in the proper ratio and mixtures, and components are often capable of producing homemade explosives ("HME") and improvised explosive devices (IEDs). Included in the possible HME are: Triacetone triperoxide ("TATP"), hexamethylene triperoxide diamine ("HMTD"), pentaerythritol tetranitrate ("PETN"), erythritol tetranitrate ("ETN"), nitroglycerin ("NG"), urea nitrate, and flash powder.

**ELLABOUDY Claimed to Distill Nitric Acid Seeking Higher Concentrations**

13. On or about December 4, 2024, FBI Special Agent Christopher Breitkreitz and I interviewed ELLABOUDY's immediate supervisor, K.R., Department of Energy, Nuclear Security Division. During this interview, K.R. stated that on or about November 13, 2024, ELLABOUDY requested sick leave for an unspecified reason. Upon ELLABOUDY's return to work, ELLABOUDY explained that he requested sick leave because he was exposed to a concentrated form of nitric acid on or about the day prior. According to K.R., ELLABOUDY, unsolicited, claimed he intended to use the nitric acid as an ingredient for rocket propellant.

14. On December 13, 2024, I conducted a follow-up interview with K.R. During this interview, K.R. relayed that ELLABOUDY stated he had purchased chemistry equipment to distil nitric acid because he could not acquire it in high enough concentrations through commercial means. ELLABOUDY stated he was distilling the nitric acid in his backyard. ELLABOUDY further stated he needed to distill his own nitric acid because it was difficult to get the components for amateur rocketry. K.R. advised ELLABOUDY had not discussed rocketry before or since

that conversation. Based on my training and experience, and conversations with explosives experts, I am aware that nitric acid is a common ingredient in several forms of explosives and explosive materials.

**Introduction of FBI Confidential Human Sources ("CHS")**

15. During this investigation, an FBI CHS ("CHS1")[2] was introduced to ELLABOUDY. Following this introduction, on or about April 19, 2025, during an in-person interaction, ELLABOUDY explained to CHS1 that he had projects he was working on at home, but he did not elaborate further. Rather, ELLABOUDY told a well-known Islamic fable about the Prophet Ibrahim being thrown into a large fire and a small bird bringing water in its beak to help extinguish the fire. Then ELLABOUDY said, referring to himself in comparison to the little bird, that ELLABOUDY is doing what little he can, but did not elaborate further. ELLABOUDY subsequently invited CHS1 over to the Ellaboudy Residence.

16. Inside the Ellaboudy Residence, CHS1 observed a table near the kitchen with several electronic components including chips, circuit boards, wires, and what appeared to be a digital timer. CHS1 also observed ELLABOUDY had multiple drone components and at least one complete red and black drone with four propellers commonly referred to as a quadcopter drone.

17. On or about July 5, 2025, a second FBI CHS ("CHS2")[3] was introduced to ELLABOUDY. During a recorded conversation with CHS1 and CHS2,

---

[2] CHS1 has provided information to the FBI pertaining to national security matters for over seven years. The information provided by the CHS in this investigation has been independently verified and corroborated. CHS is motivated by financial compensation and a desire to serve the U.S. Additionally, due to the operational needs of the investigation, the CHS has been provided temporary residential relocation.

[3] CHS2 has provided information to the FBI pertaining to national security matters for over ten years. CHS2 has criminal history dating back to 2016 involving fraud falsifying a public or court record. The adjudication of this matter has been withheld.

ELLABOUDY discussed drones and explained the Federal Aviation Administration ("FAA") regulations that require the use of GPS on drones. ELLABOUDY said there were ways to hide the position of the drone pilot, and then he explained how drones work and use different radio frequencies. ELLABOUDY explained how the Yemenis had been using drones to overwhelm radar defense systems, causing the system to shut down for at least at least 30 minutes. ELLABOUDY then referred to those 30 minutes as playtime. Based on the context of this statement, ELLABOUDY was likely referring to Ansarallah's use of drones targeting and attacking U.S. Navy vessels and personnel near the coast of Yemen and in the Red Sea during that time.

18. On or about July 20, 2025, during a recorded conversation with CHS1, ELLABOUDY discussed his commitment to secrecy and said he ascribes to the practice of not telling anyone about what you want to do. ELLABOUDY said his brother was arrested in Egypt for being a part of the Muslim Brotherhood even though he never carried a weapon. ELLABOUDY then explained he would join CHS1 in whatever CHS1 wanted to do, but if they were caught, ELLABOUDY could betray and blame CHS1. Based on my training and experience, criminals planning to commit acts of violence use secrecy as a way of preventing detection by law enforcement.

19. On or about August 25, 2025, during a recorded conversation with CHS1 and CHS2, ELLABOUDY expressed his intention to go to Salalah, Oman and then also to Sanaa, Yemen. During this conversation, CHS2 explained that CHS2 purchased motorhomes, also referred to as recreational vehicles ("RVs"), and sent them to Yemen where they were converted into small hospitals. After ELLABOUDY asked if CHS2 had a contact in Yemen, CHS2 affirmed having such

---

CHS2 has no other criminal history or warrants. The information provided by the CHS in this investigation has been independently verified and corroborated. CHS is motivated by financial compensation and a desire to serve the U.S.

a contact. ELLABOUDY then explained his intent to travel to Salalah, Oman and then to Sanaa, Yemen, in order to look around and make some contacts there.

20. On or about October 16, 2025, during a recorded conversation with CHS1 and CHS2, CHS2 again explained how CHS2 buys RVs in the U.S. and ships them to buyers overseas. CHS2 further explained the use of shipping containers in this endeavor and the practice of including other items within the container in addition to the RV being shipped. ELLABOUDY asked if CHS2 could help ELLABOUDY ship a tent.

**Wireless and Email Account Attribution**

21. In December 2024 and January 2025, I received business records from multiple e-commerce companies utilized by ELLABOUDY to purchase the above-mentioned chemicals and equipment, as well as records from the City of Richland, Yahoo, Inc., Apple, Inc., and Charter Communications, which indicated ELLABOUDY utilized phone number x6340 and email address ash***@yahoo.com. These records showed ELLABOUDY's accounts were associated either with the Ellaboudy Residence or a residence formerly associated with ELLABOUDY.

22. On or about September 18, 2025, business records from Verizon and Social Media/Messaging Company 1 showed the cellular and Social Media/Messaging Company 1 accounts associated with the x6340 number to also be active regularly throughout the day and registered on cellular networks in Oman. As discussed further below, this activity coincided with ELLABOUDY's travel to Oman and Yemen.

**ELLABOUDY Expressed Intent to Travel to Yemen through Oman**

23. During a previously referenced conversation with CHS1 that occurred on or about June 1, 2025, ELLABOUDY expressed significant knowledge about

Yemen and Yemenis' access to technology. ELLABOUDY further praised Yemen's mining industry and that at some point CHS1 (and presumably ELLABOUDY) would be able to collaborate with them (implying the Yemenis). Notably, ELLABOUDY also discussed reducing his social media use to avoid conflicts between his personal and professional life and the FBI's ability to access that information.

24. On or about July 5, 2025, during another recorded conversation with CHS1, ELLABOUDY said he knew people in Yemen and said it would be easier to fly to Oman and then drive to Yemen.

25. On or about July 9, 2025, during another recorded conversation with CHS1, ELLABOUDY discussed how Yemen had recently sunk two ships, one the day prior and one the day of this conversation. ELLABOUDY was very excited about these recent successes by Yemen; CHS1 specifically observed ELLABOUDY was smiling a lot while talking about the sinking of the ships.[4] ELLABOUDY said the first ship had travelled into an area that was prohibited by Yemeni authorities, but they allowed the crew from that first ship to survive. ELLABOUDY said the second ship that sailed into a prohibited area was not treated the same; only a few of the crew survived from the second ship. ELLABOUDY received this information from someone on the internet known as Yahya Saree [*ph*].

**ELLABOUDY Travels to Yemen through Oman**

26. On or about September 11, 2025, I received business records from Fareportal, Inc., a travel technology company that serves various travel agencies

---

[4] Several news media outlets, including Reuters, reported during the week of July 10, 2025, "Yemen's Houthis sank two cargo ships in the Red Sea…the first flare-up in seven months in the Iran-backed group's years-long campaign to choke global shipping in protest over the war in Gaza and the plight of the Palestinians." https://www.reuters.com/world/middle-east/houthi-attacks-merchant-ships-red-sea-2025-01-16/.

such as CheapOair. These records showed that ELLABOUDY purchased international travel through CheapOair for a flight departing on September 17, 2025 from the Pasco/Tri-Cities Airport ("PSC"), connecting in Los Angeles International Airport ("LAX") and Hamad International Airport ("DOH") in Doha, Qatar, and arriving at Salalah International Airport ("SLL") in Salalah, Oman on September 18, 2025. These records also showed ELLABOUDY made hotel reservations and rental car reservations in Salalah, Oman from September 18, 2025 to September 25, 2025.

27. On or about September 17, 2025, CSLI data showed ELLABOUDY's cellular phone registering on cellular towers at or near the PSC and then at or near LAX. The CSLI data later that day showed ELLABOUDY's cellular phone registering on cellular towers in or near DOH in Doha, Qatar.[5]

28. On or about September 18, 2025, CSLI data showed ELLABOUDY's cellular phone registering on cellular towers at or near DOH and then at or near Salalah, Oman, including near SLL.

29. On or about September 21, 2025, CSLI data showed ELLABOUDY's cellular phone registering on cellular towers west of Salalah, Oman in the vicinity of the international border of Oman and Yemen.[6]

30. On September 18, 2025, I received information generated by CBP showing ELLABOUDY was on an outbound international flight that departed LAX on September 17, 2025 scheduled to land at DOH on September 18, 2025.

31. On or about September 19, 2025, CHS sent a message in the Arabic language to ELLABOUDY, via the Signal messaging application, inquiring about

[5] The dates referenced match that of the date in the Pacific Standard Time Zone (PST), unless otherwise noted.

[6] The location data available from overseas cellular carriers is not as accurate as US-based data. Depending on the proximity to the border, a cellular phone located in one country could register on a network from within an adjacent country provided the phone.

picking up ELLABOUDY at the Ellaboudy Residence later that day. ELLABOUDY replied in the Arabic language with a message CHS1 interpreted as saying "The house is Yemen today. God willing, when I return."

**CBP Interview of ELLABOUDY During Re-Entry of the United States**

32. On September 26, 2025, ELLABOUDY returned to the U.S. through the LAX Port of Entry, applied for entry using an official U.S. passport[7], and was subsequently interviewed by CBP officials regarding his return to the U.S. During the CBP inspection interview, ELLABOUDY declared he was travelling back from Salalah, Oman and the purpose of his trip was for work. Specifically, ELLABOUDY told the CBP officers he was part of the DOE's mission that conducts inspection on U.S. missile defense systems, and he holds a Secret level security clearance. ELLABOUDY said he travelled alone for this DOE inspection, and he said his orders were received from his supervisor verbally as the DOE did not require a work order for this travel.

33. The interviewing CBP officers observed ELLABOUDY's official U.S. passport contained multiple entry and exit stamps from the Sarfait Border Post, which is an international border checkpoint located on the Oman-Yemen border, connecting the Omani town of Sarfait with Al Mahrah, Yemen.[8]

34. On October 2, 2025, the FBI and DOE interviewed ELLABOUDY's DOE supervisor, K.R. During this interview, K.R. did not have any knowledge of ELLABOUDY's international travel and had not spoken with ELLABOUDY regarding his recent period of leave. K.R. said ELLABOUDY has not had any

---

[7] According to open-source information and the U.S. Department of State website, an official U.S. passport is a special-issuance passport issued to U.S. government employees traveling abroad to carry out official duties.

[8] The information about the Sarfait Border Post was obtained from open-source research.

official travel in the last 30 days and certainly would not have had any international official travel. K.R. was not aware of any DOE missile inspection program and said ELLABOUDY was not assigned to such a program. K.R. said ELLABOUDY does not have a security clearance through the DOE and any official travel would have required written travel authorization. K.R. further noted all international official travel with the DOE requires the use of the official U.S. passport, and DOE requires those passports be stored at DOE headquarters. Those passports are shipped to the employee prior to official travel and are required to be returned to the headquarters following the official travel. K.R. did not believe ELLABOUDY had an official U.S. passport.

**ELLABOUDY Discusses His Travel to Yemen**

35. On or about October 11, 2025, during another recorded conversation with CHS1, ELLABOUDY discussed his recent travel to Yemen. ELLABOUDY said he paid about $1,400 to a man to smuggle ELLABOUDY across the border from Oman to Yemen. ELLABOUDY said he had to be smuggled into and out of Yemen. ELLABOUDY discussed the risks of such travel into Yemen and explained that his intent was to travel to Sanaa, the capital of Yemen. ELLABOUDY said it would have taken about ten hours to travel to Sanaa, but it would have been hard to reach Abdul Malik[9] or someone in his circuit. ELLABOUDY said god willing there will be another way to communicate with Malik. He said this would make it easier to travel to Sanaa.

36. Based upon open-source information, I am aware that Abdul-Malik al-Houthi is the leader of Ansarallah, a designated FTO with headquarters in Sanaa, Yemen. Additional open-source research indicates that Sanaa, Yemen has been

---

[9] Based upon the context of the conversation regarding ELLABOUDY's intent to travel to Sanaa, Yemen, ELLABOUDY likely referred to Abdul-Malik al-Houthi, the leader of Ansarallah.

under the control of Ansarallah since approximately September 2014. Based on my training and experience, I know that people, such as ELLABOUDY, seeking to meet with the leadership of a FTO may attempt to travel to the known headquarters of that FTO in order to meet such leaders.

37. Over the course of several months, during various recorded conversations with CHS1 and CHS2, ELLABOUDY repeatedly discussed his trip to Yemen. ELLABOUDY said he used his "diplomat passport" to help smuggle himself across the border into Yemen.[10] ELLABOUDY said his goal was to travel to Sanaa, the capital of Yemen, where he sought government level connections. During one of the several conversations, ELLABOUDY indicated that he told Yemeni Customs Officials that he intended to travel to consulate in Aden, which is approximately 235.5 miles south of Sanaa and in territory not under the control of Ansarallah. ELLABOUDY said he was ultimately unable to travel all the way to Sanaa.

**ELLABOUDY Acknowledges Ansarallah is a Designated FTO**

38. On or about October 25, 2025, during a recorded conversation with CHS1, ELLABOUDY discussed the designation of Ansarallah as a foreign terrorist organization. When CHS1 asked about the FTO designation of Ansarallah, ELLABOUDY laughed and said, "So what?" ELLABOUDY continued, "Terrorist. Not terrorist. They were terrorists." He explained that Yemen has been fighting since 2016. He said American supremacy is gone and the hard knocks have not yet been delivered. ELLABOUDY did not elaborate on this comment.

39. On or about March 20, 2026, during a recorded conversation with CHS1, ELLABOUDY said he believed the Houthis were waiting to attack and

[10] Based upon his possession and use of his official passport during his September 26, 2025 re-entry into the U.S., ELLABOUDY likely referred to his official passport when he talked about his diplomat passport.

everything the Houthis do is accurate. ELLABOUDY said the Houthis would attack U.S. forces in the Red Sea, and the U.S. fears that region.

**CHS2 Describes Association with Ansarallah (Houthis)**

40. On or about May 8, 2026, during a recorded conversation with CHS1 and CHS2, ELLABOUDY asked about the RV that CHS2 drove to their meeting. CHS2 explained the RV was in good condition and would be shipped to Yemen. ELLABOUDY was glad that CHS2 would be shipping it to Yemen. CHS2 explained the shipping route to ELLABOUDY and said it was ultimately destined to be delivered to Sanaa, Yemen.

41. On or about May 9, 2026, during a recorded conversation with CHS1 and CHS2, ELLABOUDY asked if CHS2's RV would be shipped to Yemen. CHS2 described the shipping route to ELLABOUDY with the destination in Yemen. CHS2 explained how the RVs were used for mobile hospitals and command centers. CHS2 further explained the cost for shipping the RV's was offset by smuggling items such as electronics and drone parts for the Houthis inside the RV. CHS2 said this smuggling operation was facilitated by a high-ranking military person in Yemen. ELLABOUDY acknowledged the operational security practices of such military personnel.

42. CHS2 later explained to ELLABOUDY that CHS2's smuggling operation was another way to provide equipment to Ansarallah. CHS2 further explained Ansarallah needed electronic equipment and drone parts. When CHS2 explained the Houthis may need someone to assist in manufacturing drones, ELLABOUDY said they, like Hezbollah, already had those skills from Iran. ELLABOUDY said he was trying to get connected with the group and was not going there to provide instruction. When CHS2 offered to introduce a high-ranking Houthi military acquaintance, ELLABOUDY said such connections were best done in person with no electronics or trackers. Based on my training and experience, I know

that criminals who seek to make connections with other potential co-conspirators prefer to conceal such introductions from the detection of law enforcement.

**ELLABOUDY Provides Technical Assistance on May 28, 2026**

43. On or about May 28, 2026, during a recorded conversation with CHS2, ELLABOUDY compared Ansarallah and HAMAS and said they have both learned to accept help from outsiders. ELLABOUDY said while he was in Yemen, he heard the different dialects used there. ELLABOUDY also discussed his knowledge of making homemade explosives that came from his military training and books. During this meeting, the FBI introduced CHS3 as a Colonel in the Ansarallah militia in Yemen. CHS3 participated in this investigation via telephone only and did not meet ELLABOUDY in person.[11]

44. CHS2 explained how CHS2 met a colonel with Ansarallah. CHS2 explained the ideological reasons why CHS2 supported Ansarallah. ELLABOUDY said Ansarallah was fighting the Saudis and, by extension, Israel. ELLABOUDY said the split between Ansarallah and the rest of Yemen was an internal fight. He further described Ansarallah as a militia and not a country with international allegiances. ELLABOUDY then dismissed Ansarallah being labeled as a terrorist group as word games.

45. CHS2 showed ELLABOUDY a storage unit in Richland, Washington that contained solar power and communications equipment that CHS2 purportedly would send to the Houthis inside an RV.[12] The storage unit did not contain any

---

[11] CHS3 has provided information to the FBI pertaining to national security matters for over eight years. CHS3 is motivated by financial compensation and a desire to serve the U.S. CHS3 received immigration benefits prior to this investigation.

[12] The equipment consisted of solar power generation components such as solar panels, solar charge controllers, low voltage disconnects, power inverters and radio communications components such as Motorola Quantar® radio repeaters, antennae, and cables.

medical or hospital-related equipment. ELLABOUDY was initially reluctant to enter the storage unit but agreed when CHS2 invited him inside. ELLABOUDY said he recognized various electrical and communications components stored therein. CHS2 took a video of the components and explained to ELLABOUDY the video would be sent to CHS3, identified to ELLABOUDY as a colonel with Ansarallah. CHS2 and ELLABOUDY departed the area in a vehicle and CHS2 received a voice message from CHS3 in response to the video; CHS2 played the message, allowing ELLABOUDY to hear the audio content, which was in the Arabic language. CHS3 praised CHS2 for the content of the video and said Ansarallah was very pleased with CHS2's work and efforts. CHS3 went on to extol CHS2 as a great mujahid[13] from afar and would be welcome to visit Yemen.

46. CHS2 claimed to not be able to understand the dialect in the voice message; ELLABOUDY said the voice message asked CHS2 to test the equipment in the storage unit to make sure the equipment worked properly. ELLABOUDY said he understood the request and offered to test the equipment. CHS2 offered ELLABOUDY a chance to rescind his offer and said CHS2 did not want to bother ELLABOUDY with this request. ELLABOUDY said he had experience working with solar power equipment and said it was very easy for him to work on. ELLABOUDY discussed the components he saw in the storage unit and assessed they were part of one system and, if he looked at the equipment, ELLABOUDY would be able to figure out which components were missing. ELLABOUDY explained how he would test the equipment and said he would test everything separately. ELLABOUDY offered to bring some of the equipment to ELLABOUDY's residence for testing.

---

[13] According to open-source information, "mujahid" is an Arabic word that means an individual engaged in "jihad," an Arabic word that means "struggle." Both terms are used by Islamic extremists to justify or legitimize acts of terrorism.

47. CHS2 again offered ELLABOUDY an opportunity to rescind the offer to help. ELLABOUDY said it was no problem and this type of work was his specialty. Later in the conversation, ELLABOUDY suggested returning to the storage unit and bringing some of the components back to ELLABOUDY's residence so ELLABOUDY could test them. ELLABOUDY explained he had everything he needed to test the components at his residence.

48. ELLABOUDY asked CHS2 what "they" wanted to do with the equipment. CHS2 explained the intent was to turn an RV into a mobile communications station out in the desert. ELLABOUDY warned they would not have enough time to test the communications equipment that night, but they would be able to check the solar power components. ELLABOUDY explained testing of the communications equipment would take longer and offered to test these components over the weekend. ELLABOUDY said he builds these systems for different agencies, and he was so familiar with those systems and weapons systems that when he sees smaller systems, he immediately knows how they work.

49. When ELLABOUDY and CHS2 returned to the storage unit, ELLABOUDY discussed the types of communications equipment and the solar power equipment stored therein. ELLABOUDY explained the process of testing the power equipment, and he identified one of the communications components as a Motorola radio. ELLABOUDY said he would have to research the specific type of radio equipment present in the storage unit. ELLABOUDY identified and examined the solar power equipment, including the solar controller, converters, and sine wave inverters, and he examined how they all connected. ELLABOUDY and CHS2 loaded multiple solar power components into the vehicle to be transported to the Ellaboudy Residence that evening. ELLABOUDY asked to leave the equipment at his residence until CHS2 returned to town. ELLABOUDY offered to assemble the

components at the Ellaboudy Residence and reiterated it was important to make sure the equipment worked.

50. CHS2 offered a third opportunity for ELLABOUDY to rescind his offer to assist with the solar power and communication equipment. ELLABOUDY insisted on helping and said this type of work was his specialty and would get part of the blessing. Based on the context of the conversation, CHS2 interpreted ELLABOUDY's comment regarding receiving part of the blessing referred to receiving a religious reward for performing a good deed to help Ansarallah.

**ELLABOUDY Provides Technical Assistance on June 25, 2026**

51. On or about June 25, 2026, during a recorded conversation with CHS2, ELLABOUDY said he tested the equipment and invited CHS2 to the garage of the Ellaboudy Residence where ELLABOUDY explained the equipment testing he conducted. He further explained the functions of different components and how they worked as a solar power generation system. ELLABOUDY discussed how to ensure the solar cells generated enough power, but he opined that would not be a problem in Yemen. ELLABOUDY explained the system would work with any type of battery, but the system was designed to be used with a lithium-ion battery. ELLABOUDY said he downloaded and read the manuals for all the components and offered to send them to CHS2. ELLABOUDY and CHS2 removed the solar power generation equipment from the garage of the Ellaboudy Residence and placed the equipment in a vehicle driven by CHS2 to transport back to the storage unit.

**ELLABOUDY Provides Technical Assistance on June 26, 2026**

52. On or about June 26, 2026, during a recorded conversation with CHS2, ELLABOUDY and CHS2 traveled to the storage unit where the electrical and communication equipment were stored. ELLABOUDY said his knowledge of the solar power generation system came from his electrical engineering background. He

further explained that in the military he learned to troubleshoot similar systems in the field and that such troubleshooting required specialized knowledge. ELLABOUDY said a person would not be able to work on this type of system unless that person is a high-level electrical engineer. ELLABOUDY continued explaining that not every electrical engineer could work on such systems, and he has specialized experience with the same.

53. ELLABOUDY said he was ready to provide any additional help if "they" needed anything. ELLABOUDY offered to fix the equipment, or assemble the systems, and then send it to "them." ELLABOUDY said it can be difficult to find people qualified to work on such systems. CHS2 later explained, based on the context of the conversation, the use of "they" and "them" referred to Ansarallah.

54. After arriving at the storage unit, ELLABOUDY noted there were no electrical outlets available at the storage unit to facilitate testing of the remaining solar power and communication equipment. ELLABOUDY said he and CHS2 would have to take the rest of the equipment back to the Ellaboudy Residence to be tested. ELLABOUDY said the equipment was set for 110 volts, but in Yemen they will need 240 volts, and this will require adjustments to the settings of the power system. ELLABOUDY said he would download the software in order to better understand some of the solar power system components. ELLABOUDY explained he and CHS2 would focus on making sure the solar power system works properly. ELLABOUDY further explained this type of testing is referred to as commissioning and required a specialized engineer to complete.

55. ELLABOUDY explained how the solar power system components would be connected in order to generate power from the solar panels and be converted from battery storage to be used. ELLABOUDY said he and CHS2 would take some of the inverters and other components back to the Ellaboudy Residence for testing.

56. ELLABOUDY explained websites that contain videos and manuals are very helpful, and he offered to share the websites with CHS2. ELLABOUDY said he and CHS2 can test the system, but if "they" need installation help, ELLABOUDY offered to get on the phone with "them." ELLABOUDY said speaking on the phone would be the easiest way to provide assistance in troubleshooting any problems with the system. ELLABOUDY said Yemenis are very smart and would have the laptops necessary to aid in troubleshooting.

57. ELLABOUDY examined the Motorola communication components, identifying one as a Motorola Quantar, in the storage unit and explained their function. ELLABOUDY explained it was a wireless radio system with which he was not familiar, so he and CHS2 would have to research those components to test them. ELLABOUDY said certain parts might be missing. ELLABOUDY asked CHS2 to photograph the Motorola Quantar so ELLABOUDY could reference the pictures in later online research. ELLABOUDY declined to bring the communication equipment back to the Ellaboudy Residence.

58. ELLABOUDY recommended future electrical and communications systems be purchased directly from China and then shipped to the intended destination. ELLABOUDY said this equipment would be shipped in containers just like CHS2 does with the RVs. ELLABOUDY said that equipment could then be shipped to places like Somalia or Oman first and then be sent to their final destination. Based on the context of this conversation, and based on my training and experience, it is likely ELLABOUDY was explaining how to source future electrical and communication equipment and systems from China and avoid a direct shipping route to Yemen and thereby conceal such assistance to Ansarallah from law enforcement. Throughout this portion of the conversation, ELLABOUDY did not specifically refer to Ansarallah, possibly in an effort to maintain plausible deniability

of the focus of this support. However, he referenced Ansarallah specifically after departing the storage unit.

59. In comparing the solar power components and the communication components, ELLABOUDY prioritized testing the solar power components first. ELLABOUDY directed CHS2 to hold the solar panels while ELLABOUDY tested them. ELLABOUDY explained the solar power components, such as the Morningstar SureSine power inverter, would need to be connected with cables, and he pointed out the storage unit contained spools of wire suitable for such connections. Using a multimeter ELLABOUDY brought from the Ellaboudy Residence, he tested approximately five solar panels to verify they functioned properly.[14] ELLABOUDY offered to bring other solar power components back to the Ellaboudy Residence for testing. ELLABOUDY then directed CHS2 to place multiple solar power components in the vehicle to be transported back to the Ellaboudy Residence. ELLABOUDY ensured CHS2 did not bring back the equipment that ELLABOUDY had already tested at the Ellaboudy Residence.

60. During the drive back to the Ellaboudy Residence, ELLABOUDY said he and CHS2 could assemble the system and show "them" that it works. ELLABOUDY further explained that he could provide a list of equipment needed to fully assemble the solar power system. ELLABOUDY said he and CHS2 should not tell "them" anything until the system is running. ELLABOUDY further offered that if "they" need anything in the future, "they" should check with ELLABOUDY first. Based on the context of the conversation, CHS2 believed ELLABOUDY was referring to Ansarallah when he referred to "they" and "them" during the conversation.

---

[14] According to open-source information, a multimeter is a portable testing tool used to measure electrical values like voltage, current, and resistance.

61. ELLABOUDY described the relatively innocuous nature of a solar power system and how that changes when it is combined with other systems. ELLABOUDY said the same thing is true with drones and that no one really knows what the separate components are until they are assembled. ELLABOUDY continued and said no one knows where the systems are being sent once the project is completed, and these types of projects require a specialized person to assemble.

62. ELLABOUDY then explained how the U.S. thought "Ansarallah" would be very limited in their ability to fight back, but now "Ansarallah" will turn the current conflict into another cold war. He further explained the U.S. hates cold wars because they are very costly, like the fighting in Iraq and Afghanistan.

63. Upon arriving at the Ellaboudy Residence, ELLABOUDY and CHS2 unloaded the solar power equipment to be tested, placing the equipment in the garage. CHS2 departed and agreed to return later that evening.

64. After CHS2 departed, video footage from FBI surveillance systems, which are only capable of capturing activities in the garage when the door is open and visible to the public, depicted ELLABOUDY arranging the solar power equipment on a table inside the garage of the Ellaboudy Residence. ELLABOUDY appeared to connect the equipment to a white extension cord that he then appeared to plug into a wall outlet of the garage. ELLABOUDY then appeared to examine the solar power components on the table.

65. When CHS2 returned to the Ellaboudy Residence, ELLABOUDY showed the solar power components on the table in the garage to CHS2. ELLABOUDY explained how each device worked and how he tested the system. ELLABOUDY said he verified the solar power equipment worked properly. ELLABOUDY explained the system still needed batteries to fully function and said he would provide information on where to purchase the batteries. ELLABOUDY said he would research how many batteries would be needed for the communication

equipment to operate. ELLABOUDY offered to draw a diagram of the solar power system for CHS2.

**ELLABOUDY Provides Technical Assistance on June 27, 2026**

66. On or about June 27, 2026, during a recorded conversation with CHS2 at the Ellaboudy Residence, ELLABOUDY gave CHS2 a piece of paper with a hand-drawn diagram of electrical components. ELLABOUDY explained the diagram depicted the solar power system with the components in the garage. ELLABOUDY explained how the TriStar® components were used in the solar power system. He further explained the power voltage, amperage, and wattage of the components and how the equipment worked with batteries or with a generator. ELLABOUDY also explained how the solar power components could be used as two parallel systems, allowing one system to be a backup in case the other fails.




*Image of Hand-Drawn Diagram from Ashton ELLABOUDY on June 27, 2026*

67. ELLABOUDY said there should be no need to conceal the batteries and the solar power equipment because such items would not be of concern to anyone who noticed the shipment. ELLABOUDY cautioned that someone might be more

concerned about the communications equipment and said hiding the antennae and scratching off the Motorola label could help prevent people from recognizing the equipment.

68. CHS2 carried the solar power equipment from the garage of the Ellaboudy Residence and placed it in CHS2's vehicle. ELLABOUDY ensured CHS2 did not take any of ELLABOUDY's property, but he then allowed CHS2 to keep one of the extension cords as it was still connected to a battery charger component of the solar power system.

69. ELLABOUDY said he researched the radio repeaters and suggested CHS2 acquire two radios in order to test the radio equipment. ELLABOUDY said he would send instructions to CHS2 about which types of handheld radios to purchase.

**ELLABOUDY Conducts Research for Motorola Quantar® Repeater**

70. On or about July 14, 2026, the DOE provided information to FBI special agents pertaining to activity detected from ELLABOUDY's DOE workstation. This information indicated that on or about June 29, 2026, ELLABOUDY bookmarked a website titled "The Quantar & Quantro Station Index Page". As detailed above, some of the communication equipment in the storage unit were Motorola Quantar® systems. ELLABOUDY downloaded a digital manual for a Quantar® Digital-Capable Station. According to the activity reviewed, ELLABOUDY appeared to spend several hours reviewing and highlighting various text throughout the manual.

71. ELLABOUDY highlighted manual content pertaining to Motorola system support contact information, hardware features, connecting external speakers, and trunking system features.[15]

72. On or about June 30, 2026, during a telephone call with CHS2, ELLABOUDY said he had contacted Motorola technical support to see if Motorola still supported the communication equipment. The Motorola representative told ELLABOUDY the device was about 25 years old and no longer supported and recommended contacting a local dealer who might have the necessary software. ELLABOUDY contacted a local dealer in order to find the software for the Motorola equipment, but that dealer did not have the software. ELLABOUDY recommended that CHS2 find software called "RSS" which might be available through the website for Company A. This conversation was not recorded.

**ELLABOUDY Provides Technical Assistance on July 14, 2026**

73. On or about July 14, 2026, during a recorded conversation with CHS2, while at the Ellaboudy Residence, ELLABOUDY and CHS2 discussed completing the testing of the solar power components located at the storage unit. ELLABOUDY and CHS2 drove to the storage unit in a vehicle used by CHS2 while also towing a rental trailer that CHS2 explained would be used to transport the solar power equipment to a shipper who would ship the equipment to the Houthis.

74. During their drive to the storage unit, ELLABOUDY asked if CHS2 was able to get the communications system with "RSS." CHS2 said the Colonel said "they" have a software engineer who could take care of such things. ELLABOUDY explained how a radio repeater system, like the Motorola Quantar®, functions. After referring to the recent attacks in Sanaa, CHS2 asked what type of system "they"

[15] According to open-source information, a trunking radio system is an advanced wireless communications setup that automatically shares a pool of frequency channels among many user groups.

would need in such a war zone. ELLABOUDY said these systems were typically used by police and fire departments and that 80% of the radio capabilities would not function without the "RSS" software.

75. ELLABOUDY said he and CHS2 could get a system to work with what "they" already have, but he and CHS2 would need to ask additional questions pertaining to what systems "they" are already using. ELLABOUDY explained how he found four people who had the firmware, but only one had the "RSS" software for the Motorola Quantar®. ELLABOUDY said he would need to figure out which version of the "RSS" software to use.

76. Once they arrived at the storage unit, ELLABOUDY suggested CHS2 not burden the Colonel with all the technical details of the communications system. ELLABOUDY later suggested CHS2 get rid of the Motorola Quantar® radio repeaters.

77. ELLABOUDY explained he and CHS2 would need to send specific inverters. ELLABOUDY placed three white boards with solar power components affixed into green plastic boxes. ELLABOUDY tested the solar panels using a multimeter. When these tests proved the panels worked properly, ELLABOUDY and CHS2 loaded the panels into the rental trailer. ELLABOUDY showed CHS2 how to test diodes, which ELLABOUDY explained was an advanced skill.

78. After testing the functionality of the solar panels, ELLABOUDY confirmed they all worked properly and could be shipped. ELLABOUDY then counted multiple solar power system components and said they could also be loaded into the trailer. ELLABOUDY told CHS2 not to send the Motorola equipment as those components did not work. ELLABOUDY and CHS2 loaded the rental trailer with all the solar panels and solar power components that were inside the storage unit. ELLABOUDY and CHS2 drove back to the Ellaboudy Residence with the rental trailer in tow.

79. During the drive back to the Ellaboudy Residence, ELLABOUDY recommended that CHS2 use a call sign when referring to the Colonel. Based upon the context of this conversation and ELLABOUDY's previous references to operational security, and based upon my training and experience, ELLABOUDY's recommendation to use a call sign was likely an attempt to provide guidance on operational security when discussing other members of Ansarallah. I am further aware that criminals and those who provide support to FTOs use such alternative labels in reference to contraband or co-conspirators in an effort to avoid detection by law enforcement.

80. CHS2 apologized to ELLABOUDY because CHS2 knew that ELLABOUDY was a busy person. ELLABOUDY said it was no problem and it would be easy to put together a list of questions for the Colonel in order to figure out the best communications equipment to order from China.

81. ELLABOUDY suggested he and CHS2 use a different shipping route and said communication items could be ordered and shipped directly from China to Jordan. ELLABOUDY said this would be cheaper. When CHS2 said this current shipment was destined to be initially received by an associate in Abu Dhabi, ELLABOUDY said the shipment of communication equipment could be shipped from China to Abu Dhabi.

82. While still in the vehicle driving back to the Ellaboudy Residence, CHS2 received a call from CHS3, the Colonel, that was placed on speaker in order to allow ELLABOUDY to listen to the call. CHS3 explained they had recently suffered an attack upon the airport in Sanaa. CHS2 and CHS3 discussed the status of the solar power equipment and the problems with the communication equipment. CHS2 explained, in reference to ELLABOUDY, that another brother was assisting CHS2 with identifying solutions for the communication equipment. CHS3 explained the importance of their assistance. At the conclusion of the call,

ELLABOUDY said he was able to understand the Colonel's dialect, and he opined the Colonel might be easier to understand because the Colonel is from Sanaa.

83. ELLABOUDY later explained that nobody, including the U.S., could control Iran or Yemen. He further said Yemen would respond to the Saudi Arabia attacks upon the Sanaa airport. The day prior to this statement, news media reported Saudi Arabia conducted airstrikes against Ansarallah, hitting the Sanaa International Airport.[16]

**ELLABOUDY Provides Technical Assistance on July 15, 2026**

84. On or about July 15, 2026, during a recorded conversation with CHS2 at the Ellaboudy Residence, ELLABOUDY invited CHS2 into the garage where ELLABOUDY explained his recent work manufacturing propellers for his drones using an epoxy and resin mold. When they returned inside the residence, ELLABOUDY began working on his laptop computer.

85. ELLABOUDY asked CHS2 about the inventory of the solar power equipment and they discussed the items that were still needed including a specific type of inverter. ELLABOUDY conducted internet research to compare technical specifications of different inverters. ELLABOUDY also researched radio communications options and said he and CHS2 could go through an identified e-commerce company. ELLABOUDY later sent a text message to CHS2 with a hyperlink for a communication equipment listing from the same e-commerce company.

86. ELLABOUDY asked CHS2 what else "they" needed. CHS2 reminded ELLABOUDY that "they" needed a diagram for the solar power system and identification of the communications systems "they" could use. ELLABOUDY used

---

[16] A July 13, 2026 news report regarding these Saudi Arabia airstrikes can be found at https://www.nbcnews.com/world/yemen/yemen-saudi-arabia-air-strike-sanna-airport-houthi-rebels-rcna587273.

an application on his laptop to sketch a diagram of the solar power system. ELLABOUDY characterized it as a primitive drawing compared to an AutoCAD program.[17] CHS2 provided an email address to ELLABOUDY. ELLABOUDY asked if CHS2 wanted to be added to OnShape.[18] ELLABOUDY said he would finish the solar power system diagram the following day and would email it to CHS2.

87. ELLABOUDY verbally provided a list of technical questions to CHS2 pertaining to requirements for a communications system. ELLABOUDY said once these technical requirements were understood, ELLABOUDY would get a price quote for "them." ELLABOUDY advised that if the Motorola representative asked which company would use the radios, ELLABOUDY and CHS2 could say they were just ham radio enthusiasts.[19] Based upon the context of the conversation, ELLABOUDY likely knew this communications system would be destined for Ansarallah and the questions would be shared with CHS3, known to ELLABOUDY as the Colonel. Additionally, based on my training and experience, I am aware that criminals and those who seek to support FTOs may attempt to acquire equipment under a false pretense to assuage any suspicions.

88. While this conversation occurred, ELLABOUDY sent a text message from his cellular phone number x6340, via an encrypted messaging application, to CHS2. The text message consisted of a hyperlink to a product listing for a power inverter hosted by an e-Commerce company[20]. Additionally, ELLABOUDY sent

---

[17] According to open-source research, AutoCAD is a CAD software application used to create precise technical drawings, floor plans, and models.

[18] According to open-source research, OnShape is an internet-based computer-aided design (CAD) application with collaboration features allowing multiple users to access and work on projects.

[19] According to open-source research, the term "ham radio" refers to amateur radio operations for recreational and emergency use.

[20] The identity of this company is known to your affiant.

an email to CHS2 from ELLABOUDY's Yahoo.com email account at ash***@yahoo.com. This email contained two attachments; both were product brochures for the Motorola WAVE PTX product portfolio and system features.[21]

**ELLABOUDY Provides Technical Assistance on July 16, 2026**

89. On or about July 16, 2026, ELLABOUDY sent a text message from his cellular phone number x6340, via the above reference encrypted messaging application, to CHS2. The text message made reference to the previous hyperlink to the e-commerce company product listing and ELLABOUDY wrote, "Don't buy this now. Will send something else[.]" ELLABOUDY followed with another product listing from Company D for a different power inverter. ELLABOUDY wrote, "This is the one you need[.]" ELLABOUDY sent another message to CHS2 consisting of a two-page .pdf file titled "Solar Config.pdf." When opened, the attachment depicted two technical drawings consisting of solar panels, fuses, batteries, inverters, generators, chargers, and an output, with the connections between each component. The title block of the technical drawing indicated it was drawn by "Ashton Ellaboudy" and dated "07/16/2026."

90. On or about August 12, 2026, the DOE provided information pertaining to activity of ELLABOUDY's DOE workstation. This information indicated that on or about July 16, 2026, ELLABOUDY used his DOE workstation to create and save a technical drawing titled "Solar Config.pdf" described as two electrical schematics depicting solar panels, batteries, and other electrical components. Approximately one minute after saving this drawing to his DOE workstation

[21] According to open-source research, the Motorola WAVE PTX is a cloud-based, push-to-talk (PTT) service that connects teams across different mobile devices, computers, and two-way radios. Both brochures were available on the Motorola website located at https://www.motorolasolutions.com/en_us/products/command-center-software/broadband-ptt-and-lmr-interoperability/wave.html.

desktop, ELLABOUDY logged in to the Yahoo.com email account for ash***@yahoo.com. The information from DOE did not include any indication the file was shared, such as being moved to removable flash media or via email from ELLABOUDY's DOE email account.

91. As stated earlier, CHS2 received a text message from ELLABOUDY containing a similar document. I reviewed the "Solar Config.pdf" file created from ELLABOUDY's DOE workstation and the file CHS2 received from ELLABOUDY's Yahoo.com email account; both files appeared very similar and were likely the same file. Based upon my training and experience, I am aware that internet-based email services, such as those provided by Yahoo.com, allow access to email accounts simultaneously and across multiple devices. I am further aware that criminals may attempt to obfuscate their activity by temporarily storing information pertaining to their criminal acts in draft emails without ever sending the email to a recipient. This information can then be retrieved by other co-conspirators or by the same criminal using a different device. This use of an internet-based email account allows for exfiltration of information, such as the "Solar Config.pdf" file, from one workstation, such as ELLABOUDY's DOE workstation, and retrieval elsewhere, such as ELLABOUDY's cellular phone. This would subsequently allow ELLABOUDY to send the "Solar Config.pdf" file to CHS2 via text message on the above reference encrypted messaging application from his cellular phone, as described above.

92. On or about August 12, 2026, the FBI and DOE interviewed ELLABOUDY's supervisor, K.R. During this interview, K.R. said ELLABOUDY's work at the Hanford Site would not require any work with radio communications systems or components. K.R. was unaware of any official reason ELLABOUDY would need to contact Motorola. K.R. was also unaware of any large-scale solar power systems on the Hanford Site. After being shown the

printouts from the "Solar Config.pdf" file, K.R. opined the technical drawings appeared rudimentary and lacked standard industry symbols commonly used in such technical drawings. K.R. said these technical drawings were not related to the Hanford Site as they lacked such technical rigor.

93. On or about August 14, 2026, the FBI received business records from PTC, Inc., the parent company of OnShape, pertaining to the account associated with email address ash***@yahoo.com. The account username was "AShton Ellabouty" and was created on January 16, 2025. These records further indicated ELLABOUDY logged into the account, and a document titled "Solar System" was created, edited, exported, and closed on July 16, 2026.[22]

94. On or about August 17, 2026, the DOE provided additional information pertaining to activity of ELLABOUDY's DOE workstation on or about August 17, 2026. This information indicated ELLABOUDY likely used his DOE workstation to login to his OnShape account, which showed multiple designs saved within his OnShape account. This included one design titled "Solar System" which resembled a technical drawing or electrical schematic.

## CONCLUSION

95. Based on the foregoing, there is probable cause to believe that ELLABOUDY has knowingly attempted to provide material support or resources, namely, personnel, services, expert advice and assistance, and electronic components, to a designated FTO, namely, Ansarallah, knowing that Ansarallah was a designated FTO, and that Ansarallah had engaged in and was engaging in terrorist activity and terrorism, in violation of 18 U.S.C. § 2339B(a)(1).

---

[22] PTC, Inc. representatives explained that a document "export" is the end result of an OnShape document was translated into an exportable format and then downloaded by the client.

## REQUEST FOR SEALING

96. I further request that the Court order that all papers in support of this application, including the affidavit and complaint, be sealed until further order of the court. These documents discuss an on-going criminal investigation having national security implications that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

______________________________
Justin Bodes
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and electronically signed on September 30th, 2026.

______________________________
James A. Goeke
United States Magistrate Judge